IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

United States of America

    v.                              Case No. 2:18-cr-102

Marisa Wallace

OPINION AND ORDER

By judgment entered on April 8, 2019, defendant was sentenced to concurrent terms of incarceration of 72 months on Count 1, conspiracy to distribute and to possess with the intent to distribute 500 grams or more of methamphetamine and oxycodone in violation of 21 U.S.C. §846, and Count 2, conspiracy to commit money laundering in violation of 18 U.S.C. §1956(h). According to the Bureau of Prisons ("BOP"), her projected release date is May 29, 2024. See www.bop.gov/inmateloc/ (last visited April 27, 2021).

On November 19, 2020, defendant submitted a letter which the court construed as a motion for compassionate release under §3582(c)(1)(A). See Doc. 50. On December 16, 2020, defendant filed another motion for compassionate release. Doc. 53. Appointed counsel filed a notice on December 21, 2020, indicating that he would not be supplementing defendant's motions. Doc. 54. Defendant submitted an additional letter on January 4, 2021. Doc. 56. On January 11, 2021, the government filed a response in opposition to the motions, arguing that defendant failed to show that she had exhausted her administrative remedies. Doc. 57. On January 12, 2021, defendant's motions were denied without prejudice due to her failure to exhaust administrative remedies. Doc. 58.

On March 19, 2021, defendant filed another motion for compassionate release. Doc. 59. She filed additional exhibits on

March 25 and 26, 2021, and April 8, 2021. Docs. 61, 62 and 66. On March 31, 2021, defense counsel filed a notice indicating that he did not intend to supplement defendant's motions. Doc. 64. On April 26, 2021, the government filed a response in opposition to defendant's motions. Doc. 67. The government acknowledged that defendant has exhausted her administrative remedies, but argued that the motion should be denied because the statutory sentencing factors in 18 U.S.C. §3553(a) outweigh any grounds for release. The court will therefore address defendant's request for compassionate release on the merits, and will consider all of her previous motions and filings.

I. Standards for Compassionate Release

Under §3582(c)(1)(A)(i), the court can reduce a sentence under §3582(c)(1)(A) if the court finds that "extraordinary and compelling reasons warrant such a reduction[.]" §3582(c)(1)(A)(i). District courts have full discretion to define what constitutes an "extraordinary and compelling" reason. See United States v. Jones, 980 F.3d 1109, 1111 (6th Cir. 2020). The court must also consider the factors set forth in 18 U.S.C. §3553(a) to the extent that they are applicable. §3582(c)(1)(A). If, after weighing the §3553(a) factors, the court decides that the motion is well taken, the court "may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)[.]" §3582(c)(1)(A). The grant of compassionate release is at the discretion of the court. United States v. Kincaid, 802 F. App'x 187, 188 (6th Cir. 2020).

2

II. Reasons for Compassionate Release

Defendant, who is 27 years old, submits that she should be released due to the fact that she is obese and a former smoker. She argues that these factors enhance her risk for serious illness if she contracts COVID-19. According to the Centers for Disease Control ("CDC"), persons with obesity, that is, a BMI greater than or equal to 30kg/m² and less than 40kg/m², are at an increased risk of severe symptoms if they contract COVID-19. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited April 26, 2021).

The presentence investigation report ("PSR") stated that defendant was 5'6" tall and weighed 180 pounds. Defendant's BMI is unknown. Defendant attempted to get medical records indicating her BMI from the medical records office at the institution, but was told that her BMI was not available for them to print, and that she could ask her provider. Doc. 66-1, p. 3. Even assuming that defendant's BMI would place her within the risk range, the medical records do not report any adverse physical problems specifically linked to the defendant's weight. See United States v. Tranter, 471 F. Supp.3d 861, 865 (N.D. Ind. July 8, 2020)(noting that BMI is "a notoriously blunt tool" with clinical limitations, including its inability to differentiate between excess fat, muscle and bone mass, and that defendant had not identified any current medical issues resulting from his obesity, indicating that it has little adverse effect on his overall health).

The PSR reported that defendant was in good health. A medical record listed defendant's current conditions from October, 2019,

3

through January 21, 2021, as including candidiasis, disturbances in tooth eruption and a tooth extraction, dermatitis, and a shoulder burn. Doc. 66-2, p. 1. An individualized needs plan dated November 4, 2020, reported that defendant was classified as CARE1, healthy or simple chronic care, with no medical restrictions, and that she was cleared for regular duty and food service. Doc. 53, p. 3.

Defendant also claims that she is at risk because she is a former smoker. The CDC has reported that being a current or former smoker increases the risk of severe illness from COVID-19. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. (last visited April 26, 2021). Defendant has submitted no medical records which support her claim that she is a former smoker or which document any adverse physical symptoms which she is currently experiencing or has experienced in the past due to her smoking. In Tranter, 471 F.Supp. 3d at 865, the court rejected defendant's argument that his status as a former smoker placed him at increased risk, noting that defendant had identified no adverse health effects resulting from his smoking past and that, according to the CDC, his risk of disease from smoking dropped every day he remained smoke-free.

Defendant argues that she is at increased risk due to being African-American. According to the CDC, some racial minority groups have been disproportionately affected by COVID-19 due to factors such as poverty, discrimination, lack of access to health care, type of employment, and housing. See https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/racial-ethnic-disparities/increased-risk-exposure.html (last

4

visited April 26, 2021). There is no indication that any of these factors would make defendant any more susceptible than non-minority inmates to COVID-19 in a federal institution.

On January 4, 2021, the court received a letter from the defendant reporting that she had contracted COVID-19. Doc. 56. A medical record indicated that defendant tested positive for COVID-19 on December 19, 2020, and that shw was an asymptomatic person in quarantine. Doc. 66-2, p. 1. There are no medical records reporting that defendant experienced any significant symptoms as a result of having the virus. Defendant claims that COVID has weakened her system. Doc. 56, p. 6. She noted that she was given a prescription for a rash on January 23, 2021, and claimed that multiple inmates had developed a rash after having COVID-19. Doc. 66-2, p. 2. A medical record reported a diagnosis of "Dermatitis, unspecified" on January 21, 2021, and stated that medication was provided, but included no medical opinion that this rash was the result of COVID-19. Doc. 66-2, p. 1.

Defendant argues that she is at risk of being re-infected with COVID-19, noting that new strains of the virus have entered the country. As to the likelihood that defendant will be re-infected, the BOP indicates that defendant is confined at Lexington FMC (Federal Medical Center) Satellite Camp. Lexington FMC has a total of 1,150 inmates, and 182 inmates at the camp. See www.bop.gov/locations/institutions/lex (last visited April 27, 2021. Currently no inmates and no staff have tested positive for COVID-19 at Lexington FMC, and 714 inmates and 78 staff have recovered. See https://www.bop.gov/coronavirus (last visited April 27, 2021). This indicates that the BOP has taken substantial steps

5

towards mitigating the threat of COVID-19 at the institution. Defendant has indicated that she does not plan to be vaccinated for religious reasons, but the BOP has reported that 306 staff members and 584 inmates at Lexington FMC have been vaccinated. See https://www.bop.gov/coronavirus (last visited April 27, 2021). Although defendant expresses concern that she may still be re-infected with the virus, a matter of speculation at this point, she is substantially protected because a large percentage of the inmate population at Lexington FMC have either had the virus or received the vaccine.

Considering all of the foregoing information, the defendant has not shown that her health concerns and the risks presented by COVID-19 establish an extraordinary and compelling reason for compassionate release in her case.

III. §3553(a) Factors

The court must also consider the §3553(a) factors. The offenses of conviction were serious offenses. From 2016 to 2018, defendant participated in a conspiracy to distribute and to possess with the intent to distribute 500 grams or more of methamphetamine and oxycodone, both dangerous drugs, and a conspiracy to commit money laundering. The co-conspirators obtained oxycodone prescriptions from doctors and gave the pills to defendant. Defendant stored large quantities of oxycodone at her residence which she distributed to other narcotics dealers. Defendant's relevant conduct included 11,205 30-milligram oxycodone pills and 3,175 grams of methamphetamine. She was responsible for more than $200,000 in currency exchanges and over $130,000 in cash deposits in three bank accounts. Her sentence of 72 months was near the

bottom of the Guideline range of 70-87 months applicable after departure.

As to defendant's history, at the time of sentencing, defendant was in Criminal History Category I. The PSR reported that defendant was raised by her mother, earned good grades, and had no disciplinary problems. She graduated from high school and has some college credits. She used alcohol and marijuana in the past. Defendant has presented evidence concerning her efforts at rehabilitation while incarcerated. An individualized needs plan dated November 4, 2020, reported that defendant has completed eleven classes, and that she had no incident reports in the past 6 months. Doc. 53, p. 3. Defendant is also in a cook apprenticeship program. On a work evaluation form dated March 31, 2021, defendant received mostly "outstanding" performance ratings. Doc. 66-1, p. 5. While commendable, this record is not extraordinary.

Defendant was detained for approximately 27 days before being released on bond, and was sentenced on April 5, 2019. She has now served approximately 24 months, or one-third, of her 72-month sentence. Despite the lack of a prior criminal record, defendant had no difficulty becoming involved to a significant level in a sophisticated multi-state drug conspiracy over the span of 3 years. The serious nature of her offenses presented a great danger to the public. A reduced sentence would not be sufficient to reflect the seriousness of the offenses, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public from more crimes by the defendant.

The court concludes that the §3553(a) factors warrant denying defendant's motion for compassionate release. Even assuming,

arguendo, that defendant's circumstances, including her health concerns and the threat of COVID-19, are sufficient to constitute an "extraordinary and compelling reason" for a sentence reduction, that reason is outweighed by the statutory factors which militate against defendant's early release.

IV. Request for Recommendation for Halfway House Placement

Defendant has also requested a recommendation that she be placed in a halfway house to serve the end of her sentence of incarceration. Doc. 59. Pursuant to 18 U.S.C. §3624(c)(1), BOP has the authority to permit a defendant to serve the end of a term of incarceration in a community correctional facility or residential reentry center ("RRC"), such as a halfway house, for a period not to exceed twelve months. The Bureau of Prisons also has the authority to designate the place of a defendant's imprisonment. See 18 U.S.C. §3621(b). The decision whether to permit a defendant to serve the end of a term of incarceration in an RRC, upon consideration of the factors in §3621(b), is within the discretion of the Bureau of Prisons. See Sacora v. Thomas, 628 F.3d 1059, 1066 (9th Cir. 2010); Fournier v. Zickefoose, 620 F.Supp.2d 313, 318 (D.Conn. 2009).

Although this court has no authority to order the BOP to permit defendant to serve the end of her term in a halfway house, this court is permitted to make a recommendation concerning halfway house placement. See 18 U.S.C. §3621(b)(4). However, defendant's projected release date is more than three years away, and defendant's circumstances may change during that time. The BOP will be more familiar with defendant's conduct while incarcerated and her needs upon release, and has the necessary expertise to

8

decide whether placement in a halfway house is appropriate and feasible in defendant's case. Therefore, the court declines to make a recommendation to the Bureau of Prisons concerning such placement.

V. Conclusion

In accordance with the foregoing, defendant's motions for compassionate release are denied.

Date: April 28, 2021                      s/James L. Graham
                                          James L. Graham
                                          United States District Judge